Argued and submitted October 16, 1992, affirmed December 22, 1993, reconsideration denied February 16, petition for review pending 1994

In the Matter of Sonja A. Johansen,
a Mentally Ill Person.

## STATE OF OREGON,
*Respondent,*

*v.*

## SONJA A. JOHANSEN,
*Appellant.*

(M87-4-11; CA A69256)

866 P2d 470

Thomas A. Coleman argued the cause and filed the brief for appellant.

Janet A. Metcalf, Assistant Attorney General, argued the cause for respondent. With her on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General.

Before Rossman, Presiding Judge, and De Muniz and Leeson,* Judges.

ROSSMAN, P. J.

De Muniz, J., dissenting.

---

* Leeson, J., *vice* Buttler, J., retired.

## ROSSMAN, P. J.

Appellant, a patient at Dammasch State Hospital, was involuntarily committed for 180 days in May, 1983. ORS 426.130(3).[1] Since then, she has been recommitted under ORS 426.301 to successive 180-day terms. On March 20, 1991, the trial court again ordered her committed for an additional 180-day period. Appellant seeks review of that order, contending that the recommitment procedure of ORS 426.301 to ORS 426.307 is unconstitutional on its face under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and under Article III, section 1, and Article VII (Amended), section 1, of the Oregon Constitution. We affirm.

We first address appellant's contention that Oregon's civil recommitment procedure fails to afford an allegedly mentally ill person (AMIP) the procedural safeguards required by the Due Process Clause.[2] She asserts that for the recommitment scheme to be constitutionally adequate, it must require that an adversarial hearing be provided to every individual against whom a certification for continued commitment is filed, and must require that the decision as to whether continued confinement is warranted be made by a neutral decisionmaker. The state counters that our holding in *Dietrich v. Brooks*, 27 Or App 821, 558 P2d 357 (1976), is controlling and compels the conclusion that the recommitment procedure comports with the minimum requirements of due process.

*Dietrich* involved a procedural due process challenge to *former* ORS 426.290,[3] which permitted revocation of a patient's trial visitation privileges if two individuals filed a sworn complaint and the acts complained of indicated to an examining physician that the patient should no longer be

---

[1] The version of ORS 426.130(3) in effect in 1983 limited the initial period of involuntary confinement to 180 days. The current version authorizes the court to establish a period of involuntary commitment that may exceed 180 days. ORS 426.130(1)(b)(C)(i).

[2] The Due Process Clause requires that the state provide "due process of law" when it deprives a person of "life, liberty, or property * * *." US Const, Amend XIV.

[3] *Repealed by* Or Laws 1985, ch 242, § 1. ORS 426.273, ORS 426.275 and ORS 426.292 were enacted to replace *former* ORS 426.290.

allowed to remain on trial visit. In upholding the constitutionality of the statute, we said:

"Termination of a trial visit is not an isolated event. If it were, then denial of liberty based upon the sworn statements of two people and the judgment of an admitting physician, standing alone, would be unconstitutional for lack of due process. Rather, it is one of a sequence of events within a course of confinement and treatment. *It is the procedural protection which surrounds that course of confinement and treatment which must be measured against the Due Process Clause to determine if it is appropriate to the public purpose to be served and to the nature of the individual loss to be guarded against.*" *Dietrich v. Brooks, supra,* 27 Or App at 827. (Emphasis supplied.)

We held that:

"the entire pattern of protection is constitutionally valid. A person is accorded notice, counsel, and confrontation at the initial commitment. ORS 426.100, *State v. O'Neill,* 274 Or 59, 545 P2d 97 (1976). Involuntary confinement is limited to 180 days and cannot be extended except by consent or by a similar judicial hearing, ORS 426.301 to 426.307. * * * We therefore conclude that the entire statutory scheme of involuntary commitment, including the return to the institution following a trial visit, provides procedural safeguards which satisfy the requirements of the Due Process Clause." *Dietrich v. Brooks, supra,* 27 Or App at 827-28.

Our holding in *Dietrich* that the involuntary commitment procedure, as a whole, withstands scrutiny under the Due Process Clause, is persuasive authority for the proposition that the recommitment procedure established in ORS 426.301 to ORS 426.307 provides all the "process" that is constitutionally "due." However, the constitutionality of the recommitment procedure was not at issue there, and, consequently, our holding in that case is not dispositive of the issues presented in this appeal. Nonetheless, *Dietrich* does provide important guidance with regard to the manner in which we should review the constitutionality of the recommitment procedure. Because recommitment to a mental institution is not "an isolated event," but "is one of a sequence of events within a course of confinement and treatment," 27 Or App at 827, here, as in *Dietrich,* we must look to the entire statutory scheme of involuntary commitment in

deciding whether the recommitment process meets minimum constitutional requirements.

An initial involuntary commitment can be initiated by any person or persons who give the notice required by ORS 426.070(2)[4] to the community mental health and development disabilities program director or a designee of the director in the county where the allegedly mentally ill person resides. The director or its designee then informs the circuit court of the notification and initiates an investigation to determine whether there is probable cause to believe that the AMIP is mentally ill. ORS 426.070(3)(a), (c). Upon completion of the investigation, a report recommending whether the AMIP should be committed to a mental hospital is prepared and submitted to the court. ORS 426.070(4). If the court concludes that there is probable cause to believe that the AMIP is mentally ill, the AMIP is issued the citation described in ORS 426.090 and then brought before the court for a hearing to determine whether the AMIP is mentally ill. ORS 426.070(5)(a). A certified copy of the citation must be personally served on the AMIP prior to the hearing. ORS 426.090. The citation states the nature of the information contained in the notification and the specific reasons the person is believed to be mentally ill. It also must contain

"a notice of the time and place of the commitment hearing, the right to legal counsel, and, if requested, to have legal counsel immediately appointed, the right to subpoena

---

[4] ORS 426.070 sets out the initiation and notification requirements:

"(1) Any of the following may initiate the commitment procedures under this section by giving notice described under subsection (2) of this section:

"(a) Two persons;

"(b) The county health officer; or

"(c) Any magistrate.

"(2) For purposes of subsection (1) of this section, the notice must comply with the following:

"(a) It must be in writing under oath;

"(b) It must be given to the community mental health and development disabilities program director or a designee of the director in the county where the allegedly mentally ill person resides; and

"(c) It must state that a person within the county other than the person giving the notice is a mentally ill person and is in need of treatment, care or custody."

witnesses in behalf of the person to the hearing and other information as the court may direct." ORS 426.090.

ORS 426.090 also provides that the AMIP "shall have an opportunity to consult with legal counsel prior to being brought before the court."[5]

When the AMIP appears before the court, she must again be informed of the reason she has been summoned, the nature and possible results of the proceedings, her rights regarding representation by or appointment of counsel and her right to subpoena witnesses at the hearing. ORS 426.100(1). At the hearing, the AMIP and the person representing the state may cross-examine all witnesses, examining physicians,[6] other qualified medical examiners and the persons responsible for preparing the investigation report. ORS 426.095.[7] If, after hearing all the evidence and reviewing the findings of the examiners, the court is persuaded by clear and convincing evidence that the person is mentally ill,[8] then it

---

[5] If requested by the AMIP, her attorney or guardian or the person representing the state, the court may postpone the hearing to allow time for the parties to prepare. ORS 426.095(2)(c).

[6] ORS 426.110(1) requires that the court appoint at least one qualified examiner and, if requested, one additional examiner.

[7] ORS 426.095(4) permits the court to consider as evidence medical records from the current involuntary prehearing period of detention, the investigation report, the testimony of any treating physicians for the prehearing period of detention and

"statements attributed by the maker of the medical records or the investigation report to witnesses concerning their own observations in the absence of objection or if such persons are produced as witnesses at the hearing available for cross-examination."

[8] ORS 426.005(2) provides that a "mentally ill person" is

"a person who, because of a mental disorder, is one or more of the following:

"(a)  Dangerous to self or others.

"(b)  Unable to provide for basic personal needs and is not receiving such care as is necessary for health or safety.

"(c)  A person who:

"(A)  Is chronically mentally ill, as defined in ORS 426.495;

"(B)  Within the previous three years, has twice been placed in a hospital or approved inpatient facility by the division under ORS 426.060;

"(C)  Is exhibiting symptoms or behavior substantially similar to those that preceded and led to one or more of the hospitalizations or inpatient placements referred to in subparagraph (B) of this paragraph; and

"(D)  Unless treated, will continue, to a reasonable medical probability, to

may order the person committed to a mental hospital for a period of time to be established by the court. ORS 426.130 (1)(b)(C).

ORS 426.301 to ORS 426.307 describes the procedures by which the period of initial commitment may be extended. ORS 426.301 provides that a patient is to be released from the custody of the Mental Health and Developmental Disabilities Services Division at the end of the patient's term of commitment

> "unless the [D]ivision certifies to the court in the county where the treating facility is located that the [patient] is still mentally ill and in need of further treatment." ORS 426.301(1).

The Division may delegate to the hospital director the responsibility for making the "certification." That director must consult with "the community mental health and developmental disabilities program director of the county of residence prior to making the certification." ORS 426.301(1). If the certification is made, the patient is not released. Either the hospital director or a designee serves the certification upon the patient. The hospital director then informs the circuit court in writing of the fact and date of service. ORS 426.301(2). ORS 426.301(3) requires that the certification advise the patient:

> "(a)   That the division or facility has requested that commitment be continued for an additional period of time.
>
> "(b)   That the person may consult with legal counsel and that legal counsel will be provided for the person without cost if the person is unable to afford legal counsel.
>
> "(c)   That the person may protest this further commitment within 14 days, and if the person does not commitment will be continued for an indefinite period of time up to 180 days.
>
> "(d)   That if the person does protest a further period of commitment, the person is entitled to a hearing before the court on whether the commitment should be continued."

The certification must also apprise the patient that a protest may be made either orally or in writing by signing the form

---

physically or mentally deteriorate so that the person will become a person described under either or both paragraph (a) or (b) of this subsection."

accompanying the certification and that the patient is entitled to have a physician or other qualified person[9] examine her and report the results to the court. ORS 426.301(3)(e).[10]

The person who serves the certification on the patient must read and deliver it to the patient and ask whether she protests the further period of commitment. If the patient does not protest within 14 days of service of the certification,

> "the [D]ivision or facility shall so notify the court and the court shall, without further hearing, order the commitment of the [patient] for an additional indefinite period of time up to 180 days." ORS 426.301(5).

If the patient does protest within the 14-day period, she is brought before the court and again advised that continuation of commitment has been requested and that if she does not protest, "the commitment will be continued for an indefinite period of time up to 180 days." ORS 426.303. Upon the patient's request, the court must conduct a hearing *de novo* to determine whether the patient is still mentally ill and in need of further treatment. If the court answers both questions in the affirmative, it "may order commitment to the [D]ivision for an additional indefinite period of time up to 180 days." ORS 426.307(6).

■ With those commitment procedures in mind, we return to appellant's claim that the procedure for extending the initial period of confinement fails to satisfy the strictures of the Due Process Clause. Involuntary commitment, or recommitment, to a mental institution involves a "massive curtailment of liberty," *Vitek v. Jones*, 445 US 480, 491, 100 S Ct 1254, 63 L Ed 2d 552 (1980), and, consequently, invokes due process protections. *Parham v. J.R.*, 442 US 584, 600, 99 S Ct 2493, 61 L Ed 2d 101 (1979); *Addington v. Texas*, 441 US 418, 425, 99 S Ct 1804, 60 L Ed 2d 323 (1979). As the Supreme Court recognized in *Vitek v. Jones, supra:*

---

[9] The physician or other person cannot be a member of the staff at the facility where the patient is confined. ORS 426.301(3)(e).

[10] In addition, the certification must notify the patient that she may subpoena witnesses and offer evidence on her behalf at the hearing and that if the patient lacks funds to retain legal counsel or an examining physician or other qualified person, the court will have one appointed at no cost to the patient. ORS 426.301(f), (g).

"The loss of liberty produced by an involuntary commitment is more than a loss of freedom from confinement. It is indisputable that commitment to a mental hospital 'can engender adverse social consequences to the individual' and that '[w]hether we label this phenomena "stigma" or choose to call it something else * * * we recognize that it can occur and that it does have a significant impact on the individual.' " 445 US at 492. (Citations omitted.)

The state concedes that the involuntary extension of a patient's period of confinement implicates the patient's constitutionally protected liberty interest in avoiding mental hospitalization. It contends, however, that the recommitment procedure, when considered in conjunction with the procedural safeguards afforded an AMIP upon initial commitment, does not contain any constitutional infirmity.

■      It has long been recognized that due process "is not a technical conception with a fixed content unrelated to time, place and circumstances," *Cafeteria Workers v. McElroy*, 367 US 886, 895, 81 S Ct 1743, 6 L Ed 2d 1230 (1961), but is instead a flexible concept that "calls for such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 US 471, 481, 92 S Ct 2593, 33 L Ed 2d 484 (1972). To determine what procedural protections the constitution requires and whether a disputed procedure provides those protections, we apply the three-prong balancing test first articulated in *Mathews v. Eldridge*, 424 US 319, 335, 96 S Ct 893, 47 L Ed 2d 18 (1976):

"First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

Applying those criteria, we first consider the patient's liberty interest in avoiding continued confinement in a mental hospital. As discussed above, because of the "massive curtailment of liberty" that results from involuntary commitment or recommitment to a mental facility, a patient has a substantial liberty interest in obtaining a release from further confinement. An extended period of

commitment pursuant to ORS 426.301 to ORS 426.307 clearly infringes on this liberty interest.

■      We next consider the likelihood of an erroneous recommitment under the current procedure employed by the state. Appellant claims that the recommitment process is inherently error prone, because it places the burden of obtaining judicial review of the certification entirely on the patient, who, appellant argues, cannot realistically be expected to initiate the review process. Appellant's argument in this regard is based on the Ninth Circuit Court of Appeals' decision in *Doe v. Gallinot*, 657 F2d 1017 (9th Cir 1981).[11] *Gallinot* involved a due process challenge to a procedure that allowed certain designated persons to effect an emergency detention of a person in a mental hospital for up to 72 hours. During the 72-hour period, the person was psychologically evaluated by hospital staff and either released or held for the entire 72 hours.

At the end of the 72-hour detention, the person could be "certified" by the staff for up to 14 additional days of treatment. To certify a person, a notice of certification had to be delivered personally to the patient. The person who delivered the notice was required to inform the patient of her right to petition for a writ of *habeas corpus* to obtain judicial review of the certification, to explain the *habeas corpus* procedure to her and to inform her of her right to counsel. If she requested a writ or otherwise indicated a desire to be released, she signed a written release form, which was given to the person in charge of the facility. That person then informed the court

---

[11] Appellant also relies on *Zinermon v. Burch*, 494 US 113, 110 S Ct 975, 108 L Ed 2d 100 (1990), as support for her claim that the recommitment procedure fails to satisfy the minimum requirements of due process. In *Zinermon*, however, the issue was whether the appellant's complaint stated a claim under 42 USC § 1983 for violation of the petitioner's constitutional rights under the Due Process Clause. The Court's limited holding was that *Parratt v. Taylor*, 451 US 527, 101 S Ct 1908, 68 L Ed 2d 420 (1981), which established that a post-deprivation remedy satisfies due process when the deprivation is the result of a random and unauthorized act by a state employee, did not preclude section 1983 liability under the facts presented. The Court stated that the issue to be decided was

"only whether the Parratt rule necessarily means that [petitioner's] complaint fails to allege any deprivation of due process * * *. The broader questions of what procedural safeguards the Due Process Clause requires in the context of admission to a mental hospital, and whether [the state's] statutes meet these constitutional requirements, are not presented in this case." *Zinermon v. Burch, supra*, 494 US at 117.

of the requested release and the court scheduled a hearing within two days of the writ being filed.

After considering the "certification" procedure in the light of *Mathews*, the court in *Gallinot* concluded that the procedure was constitutionally deficient. Although the procedure at issue in *Gallinot* and the one being challenged in this case both involve an individual's liberty interest in avoiding mental hospitalization, the similarity ends there. In *Gallinot*, the certification procedure authorized an *initial* involuntary commitment for up to 17 days solely on the basis of staff evaluation and without any type of hearing.[12] In the present case, we are not confronted with an initial involuntary confinement, but, rather, with an extension of an existing confinement. A patient who is "certified" for recommitment has already had an adversarial proceeding before a circuit court that had declared the patient mentally ill and in need of treatment. As for the second factor in the *Mathews* analysis, the court in *Gallinot* observed that the district court's finding that certification decisions were "highly error prone" was amply supported by the record:

> "Statistics cited by the district court showed that a substantial number of detainees who sought habeas corpus review under the existing procedures were discharged at or before the hearing. Adoption of mandatory review procedures, therefore, promises to effect a reduction in erroneous certifications." 657 F2d at 1023. (Citation omitted.)

Here, appellant has presented no evidence that certification decisions under the recommitment scheme are in any way error prone.[13] Simply making an assertion that the

---

[12] The *Gallinot* court noted:

"[I]f a patient requests habeas corpus relief on the first day of certification, and if the petition is filed immediately and a hearing is scheduled on the following day, five days of involuntary detention (72 hours plus two days of the 14-day certification period) is the *minimum* that these patients must endure. Any delay in the system would, of course, increase the time before a hearing is provided. If the patient does not request a writ of habeas corpus, then no hearing is held during the certification period and thus the patient may be detained for up to 17 days (72 hours plus 14 days) before any type of hearing is held." 657 F2d at 1020 n 3. (Emphasis in original.)

[13] Appellant alleges that there were several errors in her certification forms over the years, ranging from the court signing the certification form before the 14-day protest period had expired to the court overlooking a protest request. Although those errors may have provided procedural grounds for declaring the certification

recommitment procedure presents an undue danger of erroneous confinement does not make it so.

In our view, the involuntary commitment scheme provides several procedural mechanisms that protect against the risk of an erroneous certification. First, the patient has already been adjudged mentally ill by a circuit court in an adversary hearing in which the patient was accorded notice, counsel and confrontation. *See Dietrich v. Brooks, supra,* 27 Or App at 827. The recommitment process is not invalidated solely because the patient is required to initiate judicial review. In *Doe v. Gallinot, supra,* the district court found it noteworthy that the avenue for judicial review of the certification — *habeas corpus* — "is difficult to understand." 657 F2d at 1022. Here, in contrast, the patient may obtain judicial review simply by voicing an objection to the certification or by signing the protest form; she is not required to initiate a complex collateral proceeding to challenge the certification. Furthermore, in addition to the certification form advising the patient of the uncomplicated methods of obtaining review, the person delivering the certification must explain those methods to the patient and ask whether she wishes to protest the certification. In short, the simple and straightforward review procedure established in ORS 426.301(2)-(5) provides the patient with an accessible opportunity for judicial recourse.[14]

Second, the accuracy of the recommitment process is enhanced by the fact that the certification is made either by the Division or through the collaborative efforts of the hospital director and another mental health professional.[15] The

---

order invalid, *see State v. Gardipee,* 108 Or App 474, 814 P2d 563 (1991), they do not indicate that the *decision* to certify was wrong or that certification decisions generally are erroneous and result in unnecessary commitments.

[14] Appellant also asserts that there is a high risk of an erroneous recommitment, because "the [recommitment] process * * * allows the State to [easily] ignore the few procedural protections in ORS 426.301." Once again, appellant has attempted to launch an attack on the statute without providing any fuel for takeoff. The record is devoid of any evidence of a practice of state officials subverting the procedural safeguards provided in ORS 426.301 to ORS 426.307.

[15] Although the hospital director may not be a licensed physician, the administrative rules governing the Division require that the director will be a "Qualified Mental Health Professional." That term is defined in OAR 309-33-105(11) as any person with the following qualifications:

question of whether a patient is mentally ill and in need of further treatment is medical in nature. *See Parham v. J.R., supra*, 442 US at 609. Although the Division or the director must necessarily make findings relevant to those determinations, the ultimate resolution of those questions "turns on the *meaning* of the facts which must be interpreted by expert psychiatrists and psychologists." *Addington v. Texas, supra*, 441 US at 429. (Emphasis in original.) Thus, it cannot be seriously disputed that specialists trained in the field of mental health are better qualified than judges or administrative hearings officers to make the certification decision.

Appellant contends that the mental health specialists empowered to make the certification are not "neutral and detached" decisionmakers as required by the Due Process Clause. Again, appellant has not presented any evidence that impugns the neutrality of the mental health specialists and has failed to show that the specialists are unable to provide an independent evaluation of a patient's mental fitness. The unarticulated premise in appellant's argument appears to be that the specialists cannot be disinterested and impartial, because they are affiliated with the hospital where the patient receives treatment. However, the United States Supreme Court has recognized that, when deciding whether a person should be committed to a mental hospital, a decisionmaker within the hospital is acceptable. *See, e.g., Vitek v. Jones, supra*, 445 US at 496 (independent decisionmaker need not come from outside prison or hospital administration); *Parham v. J.R., supra*, 442 US at 607 (staff physician may determine whether child should be admitted to a mental hospital "so long as he or she is free to evaluate independently the child's mental and emotional condition and need for

---

"(a) Psychiatrist licensed to practice in the State of Oregon;

"(b) Physician licensed to practice in the State of Oregon;

"(c) Graduate degree in psychology;

"(d) Graduate degree in social work;

"(e) Graduate degree in psychiatric nursing and licensed in the State of Oregon;

"(f) Graduate degree in another mental health related field;

"(g) Any other person whose education and experience meet, in the judgment of the Division, a level of competence consistent with the responsibilities required by the Division."

treatment"). By expressing confidence in the decisions of medical examiners, we do not mean to imply that the certification procedure is entirely free of any risk of error. Indeed, "[t]he subtleties and nuances of psychiatric diagnosis render certainties virtually beyond reach in most situations." *Addington v. Texas, supra*, 441 US at 430. However, we do not believe that the substitute or additional safeguard of a mandatory judicial or administrative hearing would be of value in reducing the possibility of unnecessary recommitments. As the Court noted in *Parham v. J.R., supra*:

> "[W]e do not accept the notion that the shortcomings of specialists can always be avoided by shifting the decision from a trained specialist using the traditional tools of medical science to an untrained judge or administrative officer after a judicial-type hearing. Even after a hearing, the nonspecialist decisionmaker must make a medical-psychiatric decision. Common human experience and scholarly opinions suggest that the supposed protections of an adversary proceeding to determine the appropriateness of medical decisions for the commitment and treatment of mental and emotional illness may well be more illusory than real." 442 US at 609.

Moreover, the possibility that there may occasionally be an improper recommitment does not afford a rational predicate for striking down the entire recommitment scheme, for "[s]uch cases, if they are found, can be dealt with individually; they do not lend themselves to class-action remedies." *Parham v. J.R., supra*, 442 US at 616.

> "[P]rocedural due process rules are shaped by the risk of error inherent in the truthfinding process as applied to the generality of cases, not the rare exceptions." *Mathews v. Elridge, supra*, 424 US at 344.

In essence, appellant is asking that we act to repair the recommitment procedure even though she has presented no evidence that the procedure is broken. The Due Process Clause does not require such precipitous action.

■     Finally, we note that the state has a significant interest under its *parens patriae* powers "in providing care to its citizens who are unable because of emotional disorders to care for themselves" and in protecting others in the community from the dangerous proclivities of some who are mentally ill. *Addington v. Texas, supra*, 441 US at 426; *Grant v.*

*Johnson*, 757 F Supp 1127, 1134 (D Or 1991). The state also has a substantial interest in allocating priority to the diagnosis and treatment of patients, rather than to "time consuming procedural minuets" performed after admittance to justify continuing a patient's confinement. *See Parham v. J.R., supra*, 442 US at 605. Requiring a formal hearing for every patient in connection with a certification decision would undoubtedly increase the amount of time that mental health specialists would spend preparing for and participating in hearings and would reduce the amount of time they would spend performing the rehabilitative tasks for which they have been trained. As the Court observed in *Parham v. J.R., supra*, 442 US at 605-06, "[b]ehavioral experts in courtrooms and hearings are of little help to patients."

Given that appellant has failed to demonstrate that the recommitment process involves a constitutionally impermissible risk of error, and considering the involuntary commitment and recommitment procedures in light of the AMIP's liberty interest in freedom from restraint and the government's interest in the well-being of its citizenry, we conclude that the balance tips in favor of the constitutionality of the recommitment process. We hold that the recommitment procedure established in ORS 426.301 to ORS 426.307 provides the minimum due process protections owed to the patient.

Because the statute affords an adequate opportunity for judicial review of the certification decision, appellant's claim that the recommitment procedure contravenes the separation of powers doctrine of Article III, section 1, of the Oregon Constitution,[16] must fail. *See Perkey v. Psychiatric Security Review Board*, 65 Or App 259, 263-64, 670 P2d 1061 (1983). For the same reason, ORS 426.301 to ORS 426.307 do not constitute an "outright hindrance of a court's ability to adjudicate a case," nor does it entail "the substantial destruction of the exercise of a power essential to the adjudicatory

---

[16] Article III, section 1, provides:

"The powers of the Government shall be divided into three separate departments, the Legislative, the Executive, including administrative, and the Judicial; and no person charged with official duties under one of these departments shall exercise any of the functions of another, except as in this Constitution expressly provided."

function." *Circuit Court v. AFSCME*, 295 Or 542, 551, 669 P2d 314 (1983). Consequently, appellant's claim under Article VII (Amended), section 1,[17] also fails.

Affirmed.

**De MUNIZ, J.,** dissenting.

Appellant was originally involuntarily committed to a state mental hospital in 1983. Since then, she has been recommitted, under ORS 426.301 to ORS 426.307, to successive 180-day terms. Before each recommitment, she has allegedly waived her rights to counsel and to a court hearing to contest the recommitment. I disagree with the majority's conclusion that the recommitment procedures contained in ORS 426.301 to ORS 426.307 do not violate appellant's due process rights under the United States Constitution. Accordingly, I dissent.

The majority correctly recognizes that appellant has a substantial liberty interest in obtaining a release from further confinement. In the light of that liberty interest, the constitutionality, under the Due Process Clause, of the recommitment procedure in ORS 426.301, must be determined by the balancing of a number of factors. In *Mathews v. Eldridge*, 424 US 319, 335, 96 S Ct 893, 47 L Ed 2d 18 (1976), the United States Supreme Court identified those factors:

> "First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail."

The majority purports to balance each of the *Mathews v. Eldridge* factors. My disagreement with the majority centers on its conclusion that the "several procedural mechanisms [in ORS 426.301 to ORS 426.307] that protect against the risk of erroneous [recommitment]," 125

---

[17] Article VII (Amended), section 1, provides, in part:

"The judicial power of the state shall be vested in one supreme court and in such other courts as may from time to time be created by law."

Or App at 376, are sufficient under the Due Process Clause. In my view, those so-called "procedural mechanisms" are, for the most part, illusory and do not withstand constitutional scrutiny.

The recommitment procedure in ORS 426.301 is very much like the initial involuntary commitment procedure that was found constitutionally deficient by the Ninth Circuit Court of Appeals in *Doe v. Gallinot*, 657 F2d 1017 (9th Cir 1981). *Gallinot* involved a due process challenge to a procedure that allowed for the emergency detention of a person in a mental hospital for up to 72 hours. At the end of the 72-hour detention, the person could be certified by the staff for up to 14 additional days of treatment. The certification notice had to be delivered personally to the patient. At that time, the person delivering the notice was required to inform the patient of her right to counsel and the right to obtain judicial review of the certification through *habeas corpus*. Judicial review occurred only if the patient requested a writ of *habeas corpus* or otherwise indicated to the person delivering the certification that she desired to be released. That person then informed the court of the requested release and the court scheduled a hearing within two days of the writ being filed.

In concluding that placing the burden on the protected person to initiate judicial review was not a sufficient protection from erroneous commitment under the Due Process Clause, the court stated:

"No matter how elaborate and accurate the habeas corpus proceedings available under the LPS Act may be once undertaken, their protection is illusory when a large segment of the protected class cannot realistically be expected to set the proceedings into motion in the first place. It is the state, after all, which must ultimately justify depriving a person of a protected liberty interest by determining that good cause exists for the deprivation. *Suzuki v. Yuen*, 617 F.2d 173, 175-78 (9th Cir. 1980). Indeed, the irony of the appellants' argument is that the more accurate the determinations of the statutory habeas corpus proceedings may be, the more irrational it is to afford those proceedings only to those in a position to request them." 657 F2d at 1023. (Footnote omitted.)

The majority attempts to distinguish *Gallinot* on three grounds. First it points out that, unlike *Gallinot*, appellant

has offered "no evidence that certification decisions under the recommitment scheme [in ORS 426.301 to ORS 426.307] are in any way error prone." 125 Or App at 375. The majority is correct that, in *Gallinot*, evidence in the record " 'showed that a substantial number of detainees who sought habeas corpus review under the existing procedures were discharged at or before the hearing.' " 125 Or App at 375; 657 F2d at 1023. However, a close reading of *Gallinot* reveals that that evidence, while supporting the court's legal analysis, was not an indispensable part of its ultimate conclusion. Instead, central to the court's conclusion that the procedure violated the Due Process Clause was its determination that procedures for judicial intervention are "illusory when a large segment of the protected class cannot realistically be expected to set the proceedings into motion in the first place." 657 F2d at 1023.

That conclusion was based on a plain reading of the statutes involved and an acknowledgement by the court of the adverse setting in which the protected person was expected to initiate judicial review. In that regard, the court noted that in the mental facility setting, the protected person may be incapable of invoking her "procedural rights" and initiating judicial review, because she may be under heavy sedation; she may be inhibited by her surroundings, intimidated by or distrustful of the staff, or may feel obliged to cooperate with the staff who control nearly every aspect of her life; she may be unaccustomed to or afraid of courts and attorneys and, therefore, reluctant to protest review; she may be afraid of even a relatively innocuous requirement such as signing the form requesting relief. *Doe v. Gallinot, supra*, 657 at 1023 n 7.

It is beyond dispute that the same adverse setting exists here and can properly be considered by us in the facial challenge brought by appellant in this case. In summary, the majority's concern that the record contains no empirical data about erroneous recommitments has very little impact on the legal analysis necessary to determine whether there is a significant *risk* of an erroneous recommitment under the procedure in ORS 426.301.

Second, the majority attempts to distinguish *Gallinot* on the ground that it involved an initial confinement procedure, not "an extension of an existing confinement," or

"[a] patient * * * 'certified' for recommitment [that] has already had an adversarial proceeding before a circuit court that had declared the patient mentally ill and in need of treatment." 125 Or App at 375. That distinction might be meaningful if appellant's last judicial hearing had occurred only 180 days earlier. Unfortunately, that is not the case here. Appellant's last judicial hearing, in which a neutral factfinder made a determination about the necessity of appellant's confinement, occurred more than 10 years ago. Since then, appellant has borne the heavy burden of initiating judicial review. Viewed in that light, it is difficult to conclude, as does the majority, that recommitment, under the procedures in ORS 426.201, does not involve the same risk of error present in an involuntary commitment proceeding that places the burden on the protected person to initiate a request for judicial review.

Finally, the majority attempts to distinguish *Galli-not* on the ground that the *habeas corpus* method used for seeking judicial review in that case "is difficult to understand," while here, "the patient may obtain judicial review simply by voicing an objection to the certification or signing the protest form; she is not required to initiate a complex collateral proceeding to challenge the certification." 125 Or App at 376. That distinction is meaningless. A plain reading of ORS 426.301 reveals that, although the protected person must be given a copy of the certification, which lists her right to counsel, a hearing, etc., and must be read to her, there is no requirement that anyone ascertain whether, at that moment, she is capable of understanding the rights listed in the certification. The Due Process Clause requires that meaningful notice be given and that the waiver of such fundamental rights as that of counsel and a judicial hearing must be done sentiently. *See Armstrong v. Manza*, 380 US 545, 552, 85 S Ct 1187, 14 L Ed 2d 62 (1965); *Honor v. Yamuchi*, 307 Ark 324, 329, 820 SW2d 267 (1991)(due process requires that person subject to involuntary commitment proceeding make intelligent waiver of right to counsel). In other words, the relative simplicity of voicing an objection or signing a protest form has little to do with the question of whether that procedure assures notice and a conscious and knowing waiver of the right to initiate judicial review of the recommitment decision. The simple truth here is that ORS 426.301 provides no

assurance that the protected person has any understanding of her right to initiate judicial review at the moment she is advised of that right.

Given the adverse setting in which the protected person is advised of her right to initiate judicial review and the failure of ORS 426.301 to require anyone to determine and represent to the court that the protected person was capable of understanding her right to judicial review and consciously chose not to do so, I would hold that the risk of erroneous confinement is significant and that the procedure in ORS 426.301 to ORS 426.307 violates the Due Process Clause.

Having satisfied itself that there is no significant risk of erroneous confinement under the procedures in ORS 426.301, the majority also appears to conclude that the state's interest in providing care to its citizens and protecting the community from "the dangerous proclivities of some who are mentally ill," 125 Or App at 378, means that the work of mental health specialists in state mental facilities should be unburdened by the need to participate in formal court hearings "for every patient in connection with a certification [recommitment] decision." 125 Or App at 379.

I am not unmindful of the soundness of the argument that mental health specialists are better used in the treatment of patients rather than in participating in court hearings. However, the majority's concern in that regard is misplaced. ORS 426.301 already provides for judicial review. What is missing from the procedure in ORS 426.301 is the assurance that the protection of judicial review is not illusory. In my view, that problem can be satisfied by a procedure within the institution that requires a finding that, at the time the protected person was served with a copy of the certification and informed of her rights under ORS 426.301, she was capable of fully understanding those rights and consciously waived them. In the absence of that finding appearing in the protected person's record, a judicial hearing should be mandatory.