Submitted on record and briefs June 23, resubmitted en banc November 5, 2003, affirmed February 4, 2004

In the Matter of Randall Hughes,
Alleged to be a Mentally Ill Person.

STATE OF OREGON,
*Respondent,*

*v.*

RANDALL HUGHES,
*Appellant.*

010362845; A114527

83 P3d 951

David J. Celuch and David T. McDonald & Associates, PC, filed the brief for appellant.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Paul L. Smith, Assistant Attorney General, filed the brief for respondent.

Before Deits, Chief Judge, and Edmonds, Landau, Haselton, Armstrong, Linder, Wollheim, Brewer, Schuman, and Ortega, Judges.

LANDAU, J.

Edmonds, J., dissenting.

Armstrong, J., dissenting.

## LANDAU, J.

Appellant seeks reversal of an order committing him to the Mental Health Division based on findings that he is a danger to himself and unable to provide for his basic personal needs. ORS 426.005(1)(d)(A), (B). He argues that the trial court erred in "denying [him] the opportunity to subpoena witnesses for the hearing." We affirm.

The relevant facts are not in dispute. In April 2001, appellant was brought before the Multnomah County Circuit Court based on a notice of mental illness filed by his mother and sister. They reported that appellant has a history of mental disorders dating from adolescence, that he had been off of his medications for the previous five months, that he had lost 30 to 40 pounds during that time, that he was hallucinating and yelling obscenities at people who do not exist, and that his home was filthy and full of cat feces, moldy food, and dirty laundry.

At the civil commitment hearing, appellant was represented by counsel. The hearing itself literally began with an outburst:

"[APPELLANT]: These are the people [appellant's mother and sister] that I never visit with, but where are my sons at? They're the ones that I live with all my life and raised. Okay? Yeah.

"THE COURT: Yeah.

"[APPELLANT]: (inaudible).

"THE COURT: Well, sir, if you'll bear with me just for a minute, I'm Judge Lawrence.

"[APPELLANT]: These people I never see. These people, see they, these people, they've been gone while I was raising my family. They were busy, you know, telling everyone else what to do."

The court eventually was able to call the case number and introduce appellant to his court-appointed counsel. The court then attempted to describe to appellant the nature of the proceedings. When the court attempted to advise appellant that he had the right to subpoena witnesses, the following exchange occurred:

"THE COURT: And he [counsel] could use the subpoena power, that is to say the power and process of the courts to compel the production of any evidence or witnesses who could speak in your favor. But I don't believe that's an issue, [counsel], or is it?

"[COUNSEL]: A hard time, you were speaking softly, he was—

"THE COURT: Subpoena, the subpoena.

"[APPELLANT]: Oh, is that, would you repeat the (inaudible)?

"[COUNSEL]: (Inaudible) whether we have any subpoenas?

"THE COURT: [Counsel] could use the subpoena power to compel the production of any evidence or witnesses who could speak in your favor.

"[APPELLANT]: Oh, okay. I'd like my sons, both of my sons in here because they're the only ones that live—I don't live with these people, I don't even see them.

"THE COURT: [Appellant]?

"[APPELLANT]: All they do is just try to say—

"THE COURT: [Appellant]?

"[APPELLANT]: Oh (inaudible).

"THE COURT: Let me be straight with you about that, sir.

"[APPELLANT]: With these guys—

"THE COURT: [Appellant]? I'm not going to put just—

"[APPELLANT]: What's going on with these people and—

"THE COURT: [Appellant]?

"[APPELLANT]: And I don't know what her problem is, and what all this false evidence that I—

"* * * * *

"[EXAMINER]: (Inaudible) the judge has to try and answer you, okay, about your sons, so—

"THE COURT: Your, your sons are not going to be brought into your presence.

"[APPELLANT]: Why, why? Because they're my, they're the only ones that I spend time with every day—

"THE COURT: Because—

"[APPELLANT]: They're the only ones that are witnesses. I, these people aren't witnesses. And she filed false evidence against me, illegal, it's false evidence. My kitchen floor is dirty, she says.

"THE COURT: I'm not going to put those children through this.

"* * * * *

"[COUNSEL]: (Inaudible), only witnesses that he's requested.

"THE COURT: Right.

"[APPELLANT]: I'm requesting and you're denying my truthful witness.

"[COUNSEL]: They could testify by phone as he suggested earlier or anything else, but at this point we would object both on the Oregon, U.S. Constitutional (inaudible), proceeding without being able to subpoena the witnesses that he's requested.

"THE COURT: Thank you, [counsel]. *The Court is satisfied that, that there is substantial likelihood that the children's evidence would not be helpful to [appellant] under these circumstances.*"

(Emphasis added.)

The report of the precommitment investigation was entered into evidence. Among other things, the report detailed appellant's history of mental illness and current diagnosis of bipolar disorder with psychotic symptoms, including paranoid delusions and hallucinations. The mental examiner attempted to ask appellant some questions, but was persistently interrupted by appellant's unresponsive outbursts. When questioned about whether he had been eating, he responded with a complaint about poisoning caused by a doctor. Appellant reported that he ate several times a day and that his diet consisted of vegetables, rice, milk, and

bread. When asked about the fact that his family reported a weight loss of 30 to 40 pounds, he replied that his antidepressant medication made him "blow up" and that the medication, when combined with others he had been prescribed, almost killed him. He said that he "fell dead on the floor" and that his sons could attest to that fact. He decided to stop taking the antidepressant and then began to lose weight. He insisted that he was at his normal weight. He then complained that he currently suffered a broken neck and back and that the doctor only prescribed him "poison."

Appellant's sister testified about the condition of appellant's house, that there were cat feces all over the carpeting, that there was laundry soap all over the floor, food all over the house, severe mold, and a bucket of urine in the bath tub. She said that appellant would not drink water from the house because it was poisoned and that all his food was poisoned, as well. She said that appellant had not been eating and that he had told her that he was cooking vegetables "for his fish to eat." She said that appellant yells and screams at people from his window at home or on the street. She complained that he yells profanity and once spit on a passing car and "flipped them off," which resulted in the occupants of the car chasing a niece who was with them at the time. She said that appellant remained safe so far only because members of his family had been able to protect him. Appellant interrupted every question and every answer with interjections about, among other things, his broken neck and back, about people "breaking into innocent people's houses," about the failure of his sisters to help him clean the house or give him money, and about their testimony having been paid for by the examiners.

The trial court found that appellant suffers from a mental disorder, based on the reports of the examiners and "certainly by his affect today." The court continued:

"THE COURT: He is indeed agitated, uncontrollable, angry—

"[APPELLANT]: Agitated? Shit yeah!

"THE COURT: (Inaudible).

"[APPELLANT]: Oh, he wanted me to be calm, am I calm, when she, but you're so petty.

"THE COURT: He is not eating, and he is, the Court is satisfied that, if released, [appellant] today would be unable to care for his basic needs, that he'd be unable to feed himself—

"[APPELLANT]: I've been caring for myself for over forty years, Your Honor. That's filthy. Bring my children in here—

"THE COURT: He'd be unable to clothe himself properly. He'd be unable to actually access funds for, for food.

"[APPELLANT]: —testify, that they're filthy action[s], all your filthy actions. That's a lie. I got food in my pocket! Look at my wallet. I still got food in my—

"THE COURT: And that there's clear and convincing evidence that, as a result of his mental disorder, he is a danger to himself, particularly since he is confronting strangers on the streets.

"[APPELLANT]: That's a filthy lie. It's, are you, you, anybody else going to testify or is she just going to—

"* * * * *

"THE COURT: For those reasons, the Court does find upon clear and convincing evidence that [appellant] suffers from a mental disorder and is dangerous to himself and is unable to provide for his basic personal needs and is not receiving the care necessary for his health or safety.

"[APPELLANT]: Are you just (inaudible) or are, are you pressing—

"THE COURT: The Court further finds—

"[APPELLANT]: —judgment against a good citizen.

"THE COURT: That [appellant] is either unwilling, unable or unlikely—

"[APPELLANT]: And then you're going to dibble me for months and have me kill, I mean—

"THE COURT: —to participate in treatment on a voluntary basis—

"[APPELLANT]: Sicker than I am because of your filthy food."

The hearing ended with appellant yelling that his sisters wanted to kill him.

On appeal, appellant does not challenge the trial court's findings on the merits. Instead, he argues that the trial court erred by "denying [him] the opportunity to sub-poena witnesses for the hearing." He argues that "the failure of the trial court to allow the allegedly mentally ill person to subpoena witnesses on his own behalf violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution."

The state argues that the assignment fails because (1) it is not preserved; (2) even if otherwise preserved, it is not reviewable because of a lack of an offer of proof; (3) even if the assignment is reviewable, there was no error because appellant has failed to demonstrate that the trial court abused its discretion; and (4) even if there was error, it was harmless.

We begin with the issue of preservation and the scope of any assignment of error that is properly before us. The phrasing of the assignment itself is perplexing. It is couched in terms of the trial court's erroneous denial of an "opportunity" to subpoena witnesses. Appellant, however, never explains precisely how the trial court denied him an "opportunity" to subpoena witnesses.

Under ORCP 55 C(1)(a)(ii), a subpoena to require attendance before a court "may be issued by an attorney of record of the party to the action in whose behalf the witness is required to appear, subscribed by the signature of such attorney" without the trial court having to do anything. Indeed, that is precisely what the trial court repeatedly told appellant, that is, that "he [appellant's counsel] could use the subpoena power" to compel the production of witnesses to appear in court "who could speak in your favor." When appellant complained that he wanted his children to testify, the trial court advised him that it would not permit them to testify, that it was satisfied that their testimony "would not be helpful to [appellant] under these circumstances." In response, appellant's counsel's only objection was "on the Oregon, U.S.

Constitution (inaudible) proceeding without being able to subpoena the witnesses that he's requested."

Thus, at least as we understand the record, the focus of the assignment of error is not that the trial court failed to issue a subpoena; under the rules, counsel could have issued a subpoena without the trial court's involvement. Nor is appellant's complaint that the trial court somehow interfered with appellant's counsel's authority to issue a subpoena on his own, as allowed by rule; to the contrary, the court repeatedly advised appellant of his counsel's authority to issue subpoenas on his own.

■■ The focus of appellant's assignment instead is either that (1) the trial court unconstitutionally "proceed[ed]" without first giving appellant's counsel the time to subpoena witnesses, that is, the trial court failed to allow appellant a continuance; or (2) the trial court erred in *sua sponte* declaring that, even if counsel were to subpoena the children, the court would exclude their testimony.

The problem is that appellant never asked the trial court for a continuance. *See* ORS 426.095(2)(c) (court may, for good cause shown, postpone hearing for up to five judicial days). Thus, the only issue that arguably is preserved is whether the trial court erred in declaring that, even if subpoenaed, the children would not be permitted to testify.[1]

■■ Even assuming that that issue otherwise has been preserved, however, it is not reviewable because of the absence of an offer of proof. As a general rule, a party objecting to the exclusion of evidence must supply an offer of proof. *State v. Affeld*, 307 Or 125, 128, 764 P2d 220 (1988). As the Supreme Court has explained, there are two main purposes of an offer of proof:

> "One purpose of an offer of proof is to assure that appellate courts are able to determine whether the ruling was erroneous. * * * Another purpose of an offer of proof is to assure that the trial court can make an informed decision. An offer

---

[1] Even that much is debatable, as counsel never interposed an objection on evidentiary grounds. Appellant, however, repeatedly complained to the trial court that he wanted his children to testify, and we assume for the sake of argument that that was sufficient.

of proof permits the parties to raise additional arguments, if appropriate, and gives the court an opportunity to reconsider its ruling and correct any error."

*State v. Olmstead*, 310 Or 455, 461, 800 P2d 277 (1990) (citations omitted). An offer of proof can be made by question and answer or by counsel summarizing what the proposed evidence is expected to be. *State v. Phillips*, 314 Or 460, 466, 840 P2d 666 (1992). Either method is adequate "if we are able to determine whether it was reversible error to exclude proffered evidence." *State v. Wonderling*, 104 Or App 204, 207, 799 P2d 1135 (1990).

In this case, appellant failed to make any offer of proof. His counsel did object and propose that the children be allowed to testify by telephone, but he offered no suggestion as to the content of the expected testimony. Without any record of what the children would have said if called to testify, we cannot evaluate whether the trial court erred in excluding the testimony.

■■ We turn to the dissenting opinions. Judge Edmonds begins by characterizing the scope of the assignment as whether the trial court erred in "refusing" to permit appellant to exercise his statutory right to subpoena witnesses. Having so broadly characterized the assignment, he finds it easy to conclude that the trial court erred, because the right to subpoena witnesses is statutorily—indeed, constitutionally—guaranteed. According to Judge Edmonds, no offer of proof is necessary to determine that the trial court committed reversible error, because the trial court's ruling was "procedural in nature and not dependent on the particular substantive evidence that could flow therefrom had the ruling[ ] not been made." 192 Or App at 28 (Edmonds, J., dissenting).

The short answer to Judge Edmonds is that he is attacking a straw person. As we have noted, the trial court did not refuse to permit counsel to subpoena any witnesses. The court ruled instead that, if subpoenaed, the children would not be permitted to testify because "there is substantial likelihood that the children's evidence would not be helpful" to appellant. Thus, the court made an evidentiary ruling to exclude testimony based on its substantive content.[2] Even

---

[2] Judge Edmonds claims support for his argument from *Olmstead*. The case is readily distinguishable. In *Olmstead*, the defendant was charged with driving

Judge Edmonds acknowledges that, in such cases, an offer of proof is required. *See* 192 Or App at 27 (Edmonds, J., dissenting) ("'Normally, an offer of proof is required to preserve error when a trial court excludes testimony.'" (quoting *Affeld*, 307 Or at 128)). Indeed, Judge Edmonds's own opinion at one point acknowledges that the trial court "ultimately justified its refusal to permit [appellant] to subpoena his sons as witnesses on substantive grounds." 192 Or App at 24 (Edmonds, J., dissenting). If the court's ruling excluding the children's testimony was based on "substantive grounds," then it necessarily follows that we must know the substance of the testimony to evaluate the correctness of the ruling.

Even assuming for the sake of argument that Judge Edmonds is correct that the trial court's ruling was more in the nature of a procedural ruling that, in effect, deprived appellant of the ability to subpoena witnesses, a harmless error analysis still is required. Directly on point in that regard is *State v. Bartel-Dawson*, 176 Or App 519, 520, 31 P3d 1129 (2001). In that case, the trial court failed to advise the appellant at a mental commitment hearing of her right to subpoena witnesses. The state conceded error but argued

---

under the influence of intoxicants (DUII). He gave notice of his intent to raise an affirmative defense of guilty except for insanity. The state moved to strike the defense in its entirety on the ground that it is not available in a DUII prosecution. The trial court granted the motion. On appeal, the defendant challenged the trial court's decision to strike the defense. The state averred that the assignment was not reviewable because the defendant had failed to supply an offer of proof. The Supreme Court concluded that an offer of proof was not necessary because the trial court had stricken the defense on purely legal grounds having nothing to do with the particular facts of the case. The court explained:

"One purpose of an offer of proof is to assure that appellate courts are able to determine whether the ruling was erroneous. When the trial court rules that a party may not present any evidence on a defense, on the ground that the defense is unavailable as a matter of law, that purpose is fulfilled without the need for an offer of proof. In this situation, an offer would give us no additional information that bears on the *legal* question of the availability of the defense.

"* * * When the trial court excludes an entire class of evidence by declaring, in advance, that it is inadmissible as a matter of law, the ruling renders a further offer futile."

*Olmstead*, 310 Or at 461 (emphasis in original). In this case, the trial court did not exclude an entire class of evidence inadmissible as a matter of law and without regard to the substantive content of the evidence. To the contrary, the court declared that the evidence was inadmissible *because of its substance*, that is, because "there is substantial likelihood that the children's evidence would not be helpful to [appellant] under the circumstances."

that the error was harmless. We agreed with the state that "a harmless error analysis applies" to such cases. *Id.* at 520 (citing *State v. Cach*, 172 Or App 745, 750 n 4, 19 P3d 992, *rev den*, 332 Or 316 (2001) (Kistler, J., majority) and 172 Or App at 754 (Edmonds, P. J., concurring). Thus, the trial court's supposed refusal to permit counsel to subpoena witnesses is not, by itself, the equivalent of "structural error" that requires no harmless error analysis. And, in the absence of a record as to the nature of the testimony that was thereby excluded, we cannot determine in this case whether the trial court's supposed error in fact was harmless.

We turn to Judge Armstrong's dissent. He acknowledges the evidentiary nature of the trial court's ruling and, in consequence, the need for an offer of proof. He nevertheless argues that we are in a position to determine that the trial court committed reversible error in excluding the testimony of appellant's children because, although counsel did not make an offer of proof as such, there is adequate information that may be culled from the various statements of appellant throughout the hearing for us to determine what the children would have said. According to Judge Armstrong, it is clear that the children would have given testimony about appellant's weight loss, about his ability to care for his basic needs, and that the exclusion of that testimony was not harmless.

At the outset, we respectfully disagree with Judge Armstrong that this court is obligated to comb through a record in an attempt to reconstruct, from appellant's many outbursts, suggestions as to what the children might have said if called to testify. As we have noted, the relevant case law requires that counsel either make a representation to the court summarizing the expected testimony or put a witness on the stand and make a formal offer of proof. *E.g., Phillips*, 314 Or at 466. In this case, counsel did neither.

Even assuming for the sake of argument that, in the abstract, Judge Armstrong is correct that it is appropriate for us to attempt to piece together portions of a record to satisfy the offer of proof requirement, the fact remains that, in this case, the fragments that appellant offers are not sufficient to enable us to determine whether the trial court committed reversible error. At best, appellant informed the court that

(1) he had more than one child, (2) they lived with him for some undisclosed amount of time, (3) he wanted them to testify, and (4) they could testify that he "fell dead on the floor" because of a problem with his antidepressant medications. It could be argued—as Judge Armstrong certainly does—that appellant also expected his children to testify about his ability to care for himself and his weight loss. But, even assuming that so much could be inferred from appellant's remarks, the *content* of that testimony remains a matter of speculation. Would the children have testified about the cat feces on the carpet? The laundry soap on the floor? The food all over the house? The severe mold? The urine in the bucket? What exactly would the children have said about those facts? That there were *no* cat feces on the carpet? Only *some* cat feces on the carpet? That there was *no* mold all over the house? That any mold in the house was not *severe*? There is simply no way to tell from the state of the record any of the answers to such questions.

Finally, even assuming for the sake of argument that Judge Armstrong is correct, we nevertheless would conclude that any error was harmless. Judge Armstrong asserts that the children reasonably could be expected to have testified favorably about appellant's ability to care for his basic needs and about his weight loss. Assuming that to be the case, the record remains uncontradicted that appellant has a history of mental illness dating from adolescence, that he suffers from bipolar disorder accompanied by paranoid delusions and hallucinations, that he irrationally fears that people are trying to poison him, that he has refused to take his antidepressant medications, that he dropped 30 to 40 pounds—whether because of a failure to eat (as his sister testified) or because he stopped taking his medication (as appellant testified)—in a short period of time, and that he yells and makes obscene gestures at complete strangers—including passing cars—resulting on at least one occasion in family members being threatened. Moreover, his bizarre behavior at the time of the hearing, which lends credence to the suggestion of the examiners and appellant's family that he is dangerous and cannot care for himself, cannot be ignored.

In short, we conclude that appellant's assignment of error is not reviewable and that, even if it were, any error

that the trial court committed in excluding the testimony of the children was harmless.

Affirmed.

**EDMONDS, J.,** dissenting.

We are a nation governed by the rule of law upon which our liberty depends. This case involves a deprivation of defendant's liberty because of his involuntary mental commitment pursuant to ORS chapter 426.[1] The majority rejects defendant's claim that constitutional error occurred in the hearing that led to his commitment and the resulting deprivation of his liberty because of, in its view, his failure to raise a "reviewable" issue on appeal. I emphatically dissent for the reasons that follow.

An understanding of this case begins with ORS 426.100(1)(d), which provides, in relevant part, that in an involuntary mental commitment hearing, the court shall advise the allegedly mentally ill person of "[t]he right to subpoena witnesses[.]" In *State v. Allison,* 129 Or App 47, 49-50, 877 P2d 660 (1994), we explained the import of ORS 426.100(1):

> "Involuntary commitment proceedings involve the possibility of a 'massive curtailment of liberty' and, thus, implicate due process protections. *Vitek v. Jones,* 445 US 480, 491, 100 S Ct 1254, 63 L Ed 2d 552 (1980). In Oregon, the legislature has developed the involuntary commitment procedures contained in ORS chapter 426. Those mandatory procedures are designed to ensure that all allegedly mentally ill persons get the benefit of a full and fair hearing before that person is committed. An integral part of that procedure is the advice of rights contained in ORS 426.100(1). *State v. Johansen,* 125 Or App 365, 370, 866 P2d 470 (1993)."

Here, the trial court, pursuant to the direction of the statute, informed defendant, an allegedly mentally ill person, during the involuntary mental commitment hearing that his counsel "could use the subpoena power, that is to say the power and process of the courts to compel the production of

---

[1] The trial court found by clear and convincing evidence that defendant was dangerous to himself and unable to care for his personal, basic needs.

any evidence or witnesses who could speak in your favor."
Defendant then responded immediately to the court's
explanation,

"Oh, okay. I'd like my sons, both of my sons in here
because they're the only ones that live—I don't live with
these people, I don't even see them."[2]

In turn, the trial court was not taken with the request of
defendant to subpoena his sons as witnesses. It said
promptly, "Let me be straight with you about that, sir. * * *
Your, your sons are not going to be brought into your pres-
ence." Defendant protested, "Why, why? Because they're my,
they're the only ones that I spend time with every day." How-
ever, the court remained firm in its ruling; it told defendant,
"I'm not going to put those children through this."

Later, defendant's counsel joined the request to sub-
poena defendant's sons. He urged to the court:

"They [defendant's sons] could testify by phone as he
suggested earlier or anything else, but at this point we
would object both on the Oregon, U.S. Constitutional (inau-
dible), proceeding without being able to subpoena the wit-
nesses that he requested."

Nevertheless, faced with multiple challenges to its ruling, the
trial court concluded:

"Thank you, [defense counsel]. The Court is satisfied
that, that there is substantial likelihood that the children's
evidence would not be helpful to [defendant] under these
circumstances."

On appeal, defendant contends that the trial court
erred by denying him "the opportunity to subpoena witnesses
for the hearing," relying on his due process right to have a
fair hearing. The majority refuses to review defendant's
claim of error on several grounds. Unlike the majority, I
believe that the record adequately presents a reviewable
issue and that it demonstrates that a violation of due process
occurred when the trial court refused to permit defendant to

[2] Apparently, defendant was referring to the individuals who were pursuing
the involuntary commitment.

subpoena witnesses who could give testimony relevant to the grounds for commitment.

The proper analysis is straightforward. Defendant was advised by the trial court of his right to subpoena witnesses in accordance with ORS 426.100(1)(d). He invoked that right, but the trial court refused to permit him to exercise it. In light of the above record, whatever discretion the trial court could exercise in making its ruling necessarily exceeded permissible bounds. Due process entitled defendant to a fair hearing. Under the facts of this case, that means that he was entitled to subpoena witnesses who could give testimony relevant to whether he was dangerous to himself or unable to care for his own personal basic needs. " 'Relevant evidence' means evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401 (emphasis added). Defendant told the court that he wanted to call his sons as witnesses because they were the only ones who lived with him. The relevance of the sons' testimony is self-evident; those persons who live with defendant and/or are aware of his living conditions are the persons most likely to be able to testify about whether defendant was dangerous to himself or unable to care for his own personal basic needs. Thus, the trial court's refusal to permit defendant to subpoena his sons as witnesses for the commitment hearing was procedural error, and it operated to deny defendant due process of law.

In contrast, the trial court appeared to base its ruling on the fact that defendant proposed to call his children as witnesses as opposed to calling other witnesses who do not have that particular relationship. The record does not tell us the ages of defendants' sons, nor does it appear from the record that the trial court was aware of that information.[3] They could be adults or minors. Under Oregon law, "any person who, having organs of sense can perceive, and perceiving can make known the perception to others, may be a witness." OEC 601. It would be pure speculation to conclude on this record that defendant's sons were not competent witnesses. Moreover, even if defendant's sons are minors, the enactment

---

[3] At the time of hearing, defendant was 47 years old.

of OEC 601 effectively removed any authority of the trial court to employ common-law disqualifications, so long as the requirements of the rule are met. Laird C. Kirkpatrick, *Oregon Evidence* § 601.02, Art VI-2 (4th ed 2002).

Alternatively, the trial court ruled that "there is [a] substantial likelihood that the children's testimony would not be helpful" to defendant. I can find nothing in the record that would permit the trial court to reach that conclusion. The trial court's conclusion appears, again, to be based on pure speculation. Moreover, I am unaware of any cognizable rule of law that permits a trial court to exclude the testimony of lay witnesses on the ground that their testimony is not "helpful" to a particular party.[4] In fact, OEC 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the Oregon Evidence Code, by the Constitutions of the United States and Oregon or by Oregon statutory and decisional law." In sum, the trial court's expressed grounds for prohibiting defendant from subpoenaing his sons find no support in the rules of law that define the exercise of its discretion in this matter. Its ruling was legal error.

Although the trial court ultimately justified its refusal to permit defendant to subpoena his sons as witnesses on substantive grounds, the majority decides this matter on procedural grounds regarding appellate review. It acknowledges that defendant "repeatedly complained to the trial court that he wanted his children to testify." 192 Or App at 16 n 1. Although reluctant to concede that defendant's requests preserved the issue, the majority assumes for purposes of discussion that his statements to the court were sufficient to put the court on notice of his desire to have the opportunity to issue subpoenas. Nonetheless, the majority concludes that the issue is not reviewable because of an absence of proof. Alternatively, the majority asserts that, under *State v. Bartel-Dawson*, 176 Or App 519, 31 P3d 1129 (2001), we cannot determine whether the trial court's error was harmless in the absence of a record regarding the nature

---

[4] OEC 701 limits the *opinion* testimony of lay witnesses to opinions or inferences that are rationally based on the perception of the witness and are "[h]elpful to a clear understanding of testimony of the witness or the determination of a fact in issue." That rule does not prohibit a lay witness from testifying to relevant facts that the witness perceives.

of the children's testimony. Because, according to the majority, defendant did not follow the correct procedure at the hearing, the issue he raises on appeal is not reviewable. It is correct that there are procedural irregularities in this case, but they fall at the feet of the trial court, which is charged by the constitution to afford due process to the parties that appear before it.

The record in this case begins with the trial court advising defendant of his statutory rights pursuant to ORS 426.100(1). The trial court was operating under difficult circumstances because defendant continued to interrupt the court, but nevertheless the court, with admirable patience, proceeded as the statute required. First, the court told defendant that he would be represented in the hearing by defense counsel, and it announced that "[defense counsel] will be appointed to represent [defendant] at this time[.]" Before the formal appointment by the court, defendant remarked, "Is he going to represent me? We had a little talk[.]" Next, the court explained what role defense counsel would play as defendant's lawyer in the proceeding. Then, he told defendant about the power of subpoena, as quoted above. Defendant took the court at its word, but the court summarily ruled that "your sons are not going to be brought into your presence." Despite continued pleas from defendant and his counsel, the court never wavered from that ruling.

It is within the above factual context that the analysis of the reviewability of defendant's assignment of error begins. ORAP 5.45 requires preservation of an issue in a trial court in order to raise it on appeal. The purpose of the requirement is to give both parties the opportunity to present their positions and make their record in the trial court, thus providing the trial court an opportunity to understand and avoid or correct an error of law and the necessity of an appeal. *State v. Brown,* 310 Or 347, 356, 800 P2d 259 (1990). Here, the court ruled *sua sponte.* Consequently, no question arises as to whether the state had the opportunity to present its position to the trial court. Moreover, as will be discussed in more detail below, any motion to quash would have been premature. Also, because the court ruled *sua sponte,* the second purpose underlying the rule, that of permitting the court to avoid or correct any error, is also not at stake. It is clear then

that the purposes underlying ORAP 5.45 were satisfied in this case by the record made by defendant in the trial court; if not by his own requests to the court to reconsider its ruling, then by defense counsel's objection. Although counsel did not mention the Due Process Clause specifically when he told the trial court that he objected to its ruling under the United States Constitution, there can be no doubt that the trial court was aware of the issue; after all, it was the trial court that first told defendant about his right to subpoena witnesses.

The majority remains unsatisfied by the above record. Apparently, under the majority's reasoning, defendant should have subpoenaed the witnesses in defiance of the trial court's ruling. How or when defendant would have been able to issue subpoenas under the circumstances of this case after being advised by the trial court that it would not permit his children to testify, or why such an effort would not have been futile in light of the court's ruling is not apparent from the record. Even after defendant's counsel requested that the court permit the witnesses to be contacted by telephone and to testify in that fashion, the trial court ruled that "[t]he Court is satisfied * * * that there is substantial likelihood that the children's evidence would not be helpful to [defendant] under these circumstances." In other words, the court viewed its ultimate ruling as being based on the substantive weight of the children's testimony and not on the failure of defendant to exercise the procedural predicate of the issuance of subpoenas.

The majority also hints that defendant was at fault in not asking for a continuance at some point during the hearing. However, defendant's counsel was appointed minutes before defendant was advised of the right to subpoena witnesses. When advised of the right to subpoena witnesses, defendant *immediately* invoked it, and the court immediately told him that it was not going to permit him to subpoena his children. The record is susceptible of only one inference: the trial court ruled that it would not permit defendant's sons to testify, and it was not about to change its mind regarding that ruling.

Second, the majority's requirement of an offer of proof under these circumstances is error.

> "Normally, an offer of proof is required to preserve error when a trial court excludes testimony. The purpose of the rule is to assure that appellate courts are able to determine whether it was error to exclude the evidence and whether any error was likely to have affected the result of the case."

*State v. Affeld*, 307 Or 125, 128, 764 P2d 220 (1988). In *Affeld*, after the trial court limited the scope of cross-examination of a witness, the defendant did not make an offer as to what the witness would have said in response to the questions posed. 307 Or at 127.

The rule regarding the need to make an offer of proof does not apply when the ruling sought is *not* a ruling regarding the admissibility of evidence. For instance, the Supreme Court refused to require an offer of proof in *State v. Olmstead*, 310 Or 455, 800 P2d 277 (1990), where the trial court struck a defense of guilty by insanity as a matter of law after the defendant gave notice of his intent to raise the defense. The defendant never made an offer of proof at trial concerning the nature of his alleged mental disease or defect. *Id.* at 458. After the defendant was convicted, he appealed and assigned the trial court's ruling as error. The Supreme Court asked the parties to respond to the question of whether the defendant was required to make an offer of proof to preserve the error. *Id.* It subsequently ruled that no offer of proof was required under those circumstances. *Id.* at 461. The court observed that one purpose of an offer of proof is to assure that appellate courts are able to determine whether the ruling was erroneous. The court said, "[i]n this situation, an offer would give us no additional information that bears on the *legal* question of the availability of the defense." *Id.* (emphasis in original). The court added that another purpose of an offer of proof is to assure that the parties have the opportunity to make their record so that the trial court can make an informed ruling and correct any error. On the facts before it, the court said, "there is nothing to suggest that an offer would have altered the court's analysis."[5] *Id.*

---

[5] The majority asserts that the holding in *Olmstead* is distinguishable from this case because, in that case, the trial court excluded an entire class of evidence as inadmissible as a matter of law whereas here the trial court excluded the testimony of defendant's children because of its substantive content. The majority's distinction is a distinction without a difference. Because an offer of proof would have

      This court also has recognized that offers of proof are not always necessary for purposes of the reviewability of an issue on appeal. In *Kahn v. Pony Express Courier Corp.*, 173 Or App 127, 130, 20 P3d 837 (2001), *rev den*, 332 Or 518, 32 P3d 898 (2001) the trial court denied the defendants' motion to compel production of documents. On appeal, the defendants assigned error to that ruling. The plaintiff responded that the defendants had not preserved the issue for appeal because they had failed to make an offer of proof about what the production would have demonstrated, if it had occurred. *Id.* at 131. Even though we cautioned that a party seeking production needed to make some showing that the documents sought were in fact subject to discovery, we rejected the argument that, under *Affeld*, an offer of proof was required. *Id.* at 132. In contrast to the facts in *Affeld*, we said, "[h]ere, however, the trial court did not exclude evidence; rather the trial court denied defendants' motion to compel production of documents." *Id.*

      The ruling made in this case is analogous to the rulings made in *Olmstead* and in *Kahn*. In both of those cases, as well as in this case, the rulings are not primarily evidentiary rulings about the exclusion of particular testimony; rather, the rulings are procedural in nature and not dependent on the particular substantive evidence that could flow therefrom had the rulings not been made. As the court pointed out in *Olmstead*, "[w]hether an offer of proof was required depends on how we view the nature of the state's motion and the trial court's ruling." 310 Or at 459. Defendant's right to subpoena witnesses is an absolute legal right that requires no factual or evidentiary support. No offer of proof about what the sons would have said, if they had been called to testify, would have altered the right to subpoena them. It is those circumstances that make this case analogous to *Olmstead*, where the trial court struck a defense for lack of legal sufficiency as a matter of law without regard to any evidentiary record. Similarly, the trial court in *Kahn* was not asked to exclude particular testimony or evidence. Rather, as in this case, the trial court

---

been futile in light of the trial court's ruling, it could make no difference regarding the reviewability of the issue on appeal, particularly in light of the fact that the majority does not undertake to affirm on the basis of the trial court's substantive ruling.

in that case ruled on a motion that was procedural in nature and constituted a predicate to the offer of particular evidence. For the reasons expressed in *Olmstead* and *Kahn*, the majority in this case errs by grafting the requirement of an offer of proof into ORAP 5.45 where the purposes of the rule are otherwise satisfied.

The majority is correct in one respect. The ordinary sequence of events that should have occurred, once defendant was apprised of his right to subpoena witnesses and invoked that right, would have been to permit the opportunity to exercise that right. But the court itself preempted the appropriate procedure by ruling *sua sponte* that "your sons are not going to be brought into your presence." Any further motion to continue the hearing in order to subpoena witnesses to make an offer of proof would have been futile in light of the court's preemptive ruling. As the court held in *Olmstead*, when a trial court "excludes an entire class of evidence by declaring, in advance, that it is inadmissible as a matter of law, the ruling renders a further offer futile." 310 Or at 461.

Third, the majority contends that, "in the absence of a record as to the nature of the testimony that was thereby excluded, we cannot determine in this case whether the trial court's supposed error in fact was harmless." 192 Or App at 19. In support of that proposition, the majority cites to *Bartel-Dawson*. But in that case, the only issue was whether the trial court's failure to advise the appellant in an involuntary commitment proceeding of her right to subpoena witnesses required reversal. *Bartel-Dawson*, 176 Or App at 520. We observed that the appellant was served before the hearing with a citation that informed her of the right to subpoena witnesses and that she, in fact, called a witness to testify on her behalf. *Id.* In light of those circumstances, we held that any error in the failure to advise her at the hearing of her right to subpoena witnesses was harmless error. *Id.*

The majority cites *Bartel-Dawson* for a proposition that is different from its holding. The majority says that the case is "[d]irectly on point" for the proposition that a "harmless error analysis still is required" even if the trial court deprived defendant of the ability to subpoena witnesses. 192 Or App at 18. But in substance, the majority's point is the

same as its conclusion that defendant was required to make an offer of proof about the content of defendant's sons' testimony. A "harmless error" requirement for purposes of appellate review functions for the same purposes as the requirement for an offer of proof regarding evidentiary matters. A judgment will not be reversed on appeal unless the appellant can demonstrate that the court's ruling was prejudicial to the appellant's case. Apparently, the majority means to say by its "harmless error" requirement that, in the absence of a record of the sons' testimony in this case, we cannot discern whether we would have reached a different conclusion on *de novo* review than that of the trial court because of the strength of the evidence against defendant.

With respect, that assertion, in my view, begs the question when properly framed. The statutory right to be advised of the right to subpoena witnesses and the corresponding right to subpoena witnesses exist so that defendants in involuntary commitment proceedings, who are at risk of loss of their liberty, are provided with a hearing that supplies due process of law. A denial of the right to subpoena witnesses who have relevant testimony to offer about the statutory grounds for involuntary commitment so pervasively infects the nature of an involuntary mental commitment hearing that under no circumstances can a fair hearing be held without the exercise of the right. Consequently, the prejudice to defendant in this case is manifest, even without a showing of the specific testimony of the witnesses he wanted to call.

There is a certain irony regarding the majority's reasoning and its result. In an emotionally charged setting with the liberty of defendant at stake, and in the midst of a hearing full of confusing outbursts in which the trial court was dealing, as best as it could, with constant interruptions by defendant, as well as others, defendant clearly invoked his right to subpoena identified witnesses. In just as clear of a manner, the trial court denied defendant's invocation after indicating that it understood defendant's and his counsel's requests.[6] We also know on this record, according to defendant's statements to the court, that his sons could give relevant testimony regarding the issues before the court because

---

[6] The court told defendant regarding his request to subpoena his sons, "[l]et me be straight with you about that[.]"

they were the only potential witnesses who lived with him. Generally, appellate court doctrines of preservation of issues in trial courts, offers of proof, and "harmless error" analyses function so as to give appellate courts the necessary information to determine whether the trial court erred. The irony of the majority's position is that we have in the record all the information that we need in order to conclude that the trial court erred when it denied defendant his right to subpoena witnesses.

Accordingly, I dissent.

Wollheim, J., joins in this dissent.

**ARMSTRONG, J.,** dissenting.

The majority concludes that appellant did not adequately preserve his objection to the trial court's refusal to allow him to subpoena his sons to testify at his civil commitment hearing. Because I conclude that appellant adequately preserved his objection and that the trial court erred in denying appellant's request to subpoena his sons, I respectfully dissent.

OEC 103 addresses offers of proof. It provides:

"(1) Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and:

"* * * * *

"(b) In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked."

The majority concludes that appellant and his counsel, who first met appellant at the commitment hearing, failed to make known to the trial court the evidence that the sons would provide if they were called as witnesses. It further concludes that appellant's failure to do that prevents us from deciding whether appellant was prejudiced by the court's refusal to subpoena the sons. The majority is wrong.

Appellant asked for his sons at the outset of the commitment hearing before the trial judge had even begun to speak:

"These are the people that I never visit with, but where are my sons at? They're the ones I live with all my life and raised. * * * These people I never see. These people, see they, these people, they've been gone while I was raising my family. They were busy, you know, telling everyone else what to do. * * * And my sons, I want my, and let, if you can put them on the phone, make sure I'm talking with my sons if that's cool with you, these people I never see. Okay?"

Appellant contested the testimony against him throughout the hearing, arguing that the proceeding was based on false testimony. Although his comments were often disorganized and he frequently interrupted the court, appellant repeated his request for his sons when the court complied with ORS 426.100 by informing him of his right to subpoena witnesses:

"THE COURT: [Counsel] could use the subpoena power to compel the production of any evidence or witnesses who could speak in your favor.

"[APPELLANT]: Oh, okay. I'd like my sons, both of my sons in here because they're the only ones that live—I don't live with these people, I don't even see them.

"THE COURT: [Appellant]?

"[APPELLANT]: All they do is just try to say—

"THE COURT: [Appellant]?

"[APPELLANT]: Oh (inaudible)

"THE COURT: Let me be straight with you about that, sir.

"[APPELLANT]: With these guys—

"THE COURT: [Appellant]? I'm not going to put just—

"[APPELLANT]: What's going on with these people and—

"THE COURT: [Appellant]?

"[APPELLANT]: And I don't know what her problem is, and what all this false evidence that I—

"[COUNSEL]:   [Appellant]?

"[APPELLANT]:   Okay. I'm (inaudible)—

"[EXAMINER]:   (Inaudible) the Judge has to try and answer you, okay, about your sons, so—

"THE COURT:   Your, your sons are not going to be brought into your presence.

"[APPELLANT]:   Why, why? Because they're my, they're the only ones I spend time with every day—

"THE COURT:   Because—

"[APPELLANT]:   They're the only ones that are witnesses. I, these people aren't witnesses. And she filed false evidence against me, illegal, it's false evidence. My kitchen floor is dirty, she says.

"THE COURT:   I'm not going to put children through this.

"* * * * *

"[COUNSEL]:   They could testify by phone as he suggested earlier or anything else, but at this point we would object both on the Oregon, U.S. Constitutional (inaudible), proceeding without being able to subpoena the witnesses that he's requested.

"THE COURT:   Thank you, [Counsel]. The Court is satisfied that, that there is substantial likelihood that the children's evidence would not be helpful to [Appellant] under these circumstances.

"[APPELLANT]:   Oh, yes, it would. I object to that. That's a lie. I, those is the only people that I—"

Appellant later said that his sons could rebut the testimony offered by the state about his weight loss by testifying that he was now at his normal weight and had only lost weight that he had gained as a side effect of several prescription medications. Significantly, the court based its commitment order on findings that appellant was unable to care for his basic needs and was a threat to himself. Those findings were based, at least in part, on a finding that appellant had not been eating sufficient food:

"THE COURT: He is not eating, and he is, the Court is satisfied that, if released, [Appellant] today would be unable to care for his basic needs, that he'd be unable to feed himself—

"[APPELLANT]: I've been caring for myself for over forty years, Your Honor. That's filthy. Bring my children in here—

"THE COURT: He'd be unable to clothe himself properly. He'd be unable to actually access funds for, for food."

The majority's contention that the trial court had, and therefore we have, no knowledge of what the content of appellant's sons' testimony would be is incorrect. The trial court was on notice that, if called to testify, appellant's sons would specifically rebut testimony regarding his weight loss and would likely contradict other testimony regarding appellant's ability to care for himself and provide for his basic needs. Appellant indicated that his sons knew him but that the state's witnesses did not and that, if his sons testified, they would substantiate his claim. If appellant's sons had testified, their testimony could have created a factual conflict for the trial court to resolve. The trial court's exclusion of the sons' potential testimony leaves us without the benefit of such a resolution. The information offered by appellant, however, is sufficient to allow us to determine whether the trial court's ruling amounts to prejudicial and therefore reversible error, as I will demonstrate below, and it is therefore a sufficient offer of proof. OEC 103.

Generally, a trial judge cannot exclude relevant testimony from a competent witness unless a rule of evidence allows the exclusion of the testimony. " 'Relevant evidence' means evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OEC 401. OEC 402 provides: "All relevant evidence is admissible, except as otherwise provided by the Oregon Evidence Code, by the constitutions of the United States and Oregon, or by Oregon statutory and decisional law. Evidence which is not relevant is not admissible."

Here, evidence about whether appellant was indeed well below his normal weight is relevant to whether appellant was able to care for himself, as is other testimony regarding his sons' personal observance of appellant over time. The court, however, found that "the children's evidence would not be helpful to [Appellant] under these circumstances."

OEC 403 allows a trial judge to exclude relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence." The standard of review for the exclusion of evidence under OEC 403 is abuse of discretion. *State v. Minchue*, 173 Or App 520, 523, 24 P3d 386 (2001). This review involves a determination of whether "the trial court's ruling was within the reasonable or permissible range. * * * It may be that the record will support either admission or exclusion; if so, the trial court's ruling will be affirmed * * *." *Carter v. Moberly*, 263 Or 193, 201, 501 P2d 1276 (1972).

At the hearing there was no jury to confuse, prejudice, or mislead. Appellant offered, aside from his own testimony, only his sons' testimony. The only rationale left to the trial judge then, under OEC 403, is that of undue delay. Giving the trial court the benefit of the doubt that that was its rationale for excluding the children as witnesses, the exclusion was nonetheless error.

If "offered evidence * * * has substantial probative value," a trial judge has no discretion to exclude it "unless some good reason to exclude it has been shown." *Carter*, 263 Or at 211. The sons' offered testimony has substantial probative value in that it would, if the offer proved accurate, rebut at least one key part of the state's argument regarding appellant's allegedly unhealthy weight loss. His statements about living with and raising his sons imply that, if they were allowed to testify, they would state that appellant was able to care for his own basic needs and was not a threat to himself.

A court can exercise discretion to exclude relevant evidence when its alleged harm outweighs its alleged value. Here, the trial court's stated reasons for exclusion are without foundation. The trial court seems to have prejudged

appellant as mentally ill and decided that his sons' testimony would not affect the disposition of the case and would therefore be a waste of time. The virtues of expediency and efficiency in the courts, however, do not outweigh the importance of allowing an appellant to exercise his or her statutory rights. ORS 426.100. Although appellant's request to exercise his statutory right to subpoena witnesses would surely have extended the proceeding, the legislature granted all such appellants not only the right to be told of their statutory rights, but also the right to exercise them. *Id.* Therefore, in a civil commitment proceeding the trial court commits error if it excludes a witness who would offer noncumulative, relevant, probative evidence where subpoenaing the witness would not cause a delay that created more harm than it added in value to the proceeding. Appellant and his counsel offered to have appellant's sons testify by telephone. If the court had granted that request, it would not have caused an "undue delay."

During the proceeding, the court said that it was unwilling to put appellant's children through the hearing process, and it apologized to those who participated in the proceeding. Even if founded on evidence in the record, concern about the effect on the sons of participating in the proceeding does not provide a basis to exclude their testimony. Although the legislature has approved the exclusion of children from some custody and termination proceedings, *see State ex rel Juv. Dept. v. Beasley*, 314 Or 444, 840 P2d 78 (1992), a trial court does not have the discretion to prevent a child from testifying in any other proceeding—assuming the child is a competent witness—even if participation in the proceedings may be detrimental to the child; *see, e.g., Kreutzer v. Kreutzer*, 226 Or 158, 161-62, 359 P2d 536 (1961); *see also Nichols and Fleischman*, 67 Or App 256, 260, 677 P2d 731 (1984) ("[I]f a child is otherwise competent, it is error to refuse to permit a child to testify."). Moreover, because appellant was 47 years old, his children could well have been adults rather than juveniles. In any event, even if a civil commitment proceeding can be unpleasant for the participants, a trial court cannot deny a party's request to subpoena witnesses on the ground that participation in the hearing would be unpleasant for them.

In summary, the court erred in refusing to permit appellant to subpoena his sons as witnesses and, on the record in this case, that ruling was prejudicial to appellant. I respectfully dissent.